# IN THE OREGON TAX COURT

## JOHNSON et al
*v.*
## DEPARTMENT OF REVENUE
(TC 1790)

Roderick L. Johnson, Johnson & Johnson, Corvallis, represented plaintiffs.

Alfred B. Thomas, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision, in part, for plaintiffs rendered March 18, 1983.

**SAMUEL B. STEWART, Judge.**

Plaintiffs appealed from the defendant's Order No. VL 82-126 affirming the true cash value as of January 1, 1980, of certain real property known as Cedarwood Plaza and described as Tax Lots 400 and 500 on the Benton County

assessment roll. The subject property is a partially developed commercial tract which is part of a planned unit development. Tax Lot 400 has approximately 2.35 acres and Tax Lot 500 has 1.24 acres.

The true cash value of the subject property as of January 1, 1981, is also being contested (case No. 1843) and has been consolidated with case No. 1790 for trial purposes. The parties have stipulated that the true cash value of the subject property for the tax year 1981-1982 shall be 10 percent greater than the true cash value for said property as finally determined by the court for the tax year 1980-1981.

The plaintiffs allege that the true cash value of the subject land and improvements (parking and driveway) on January 1, 1980, was $406,300 (Pl Ex 2) while the defendant contends that the true cash value was $683,200 (Def Ex A, at 23). This large discrepancy is partially the result of the plaintiffs' theory that the determination of value should be based on the "overall site utility" of the subject property, not its total physical area.

The subject property, Tax Lots 400 and 500, is an irregular, rectangular site containing 3.59 acres with 95 linear feet of frontage on Northwest Ninth Street. The plaintiffs and defendant agree that the highest and best use of the subject property is for a shopping and office plaza. This use was previously approved for the subject property when the overall development plan was approved.

The Cedarwood Plaza development, contains the subject property and North's Chuck Wagon, Skipper's Fish and Chips, Eastgate Theatre and Kinney's Shoes. These commercial establishments were sold on a net-site area, i.e., without parking and driveway, recorded covenants providing for reciprocal access and parking on the front 1.75 acres.

The subject site's 95 linear feet of frontage is a .363-acre portion consisting of an internal street and 16 parking spaces adjacent to Skipper's Fish and Chips. (Pl Ex 2, at 12.) There is an additional parking area of some 114 spaces between Eastgate Theatre, the vacant rear parcel and North's Chuck Wagon (approximately 1.387 acres).

Based upon the commitment that the internal streets and parking must be shared by the existing establishments, the plaintiffs allege that this 1.75 acres has only a 56.1 percent utility in use value because the other 43.9 percent utility (parking rights) was included in the value of the adjacent parcels when they were sold. Plaintiffs conceded that the area of "Proposed Building Site" (1.84 acres) should be valued at 100 percent utility. The plaintiffs conclude, therefore, that of the total area of the subject site, 156,380 square feet, the total marketable area is only 123,699 square feet. (Pl Ex 2, at 13.)

In addition, the plaintiffs allege that the market recognizes a distinct difference between "frontage" sites as opposed to "rearage" sites and contend that the subject property is essentially a "rearage" site.

Mr. William E. Ware, General Manager of Carl Trowbridge & Associates, Inc., appearing for the plaintiffs, offered "small frontage sales" and "large frontage and rearage sales" in a market approach to value. Based upon frontage sales, the witness alleged that the market supported a value of $5.75 per square foot and that the market recognized a rearage adjustment of minus 30 percent. (Pl Ex 2, at 16.) Therefore, Mr. Ware concluded that the subject land had a true cash value of $3 per square foot on January 1, 1980, and contended

that this value should be applied only to the marketable area of 123,699 square feet for a total true cash value of $371,000.

The witness alleged that the site improvements (driveway and parking) had a depreciated cost of $63,000 and, applying the 56.1 percent utility theory offered earlier, he concluded that the improvements had a depreciated cost of $35,300. Therefore, plaintiffs alleged that the true cash value of the subject property, land and improvements, was $406,300 on January 1, 1980.

Mr. Don J. Mason, an independent fee appraiser, appearing for the defendant, alleged that the cross-easements granted to owners of establishments within Cedarwood Plaza were of equal benefit to all, therefore, the subject property should be valued on its total land size and the total depreciated cost of its improvements instead of the percentage of utility as urged by the plaintiffs.

The witness offered five comparable sales in his market approach to valuation, making adjustments for time, location factors and physical features, and concluded that the comparable sales showed a true cash value of $3.60 per square foot for the subject land on January 1, 1980.

Comparble sale No. 1 offered by the defendant resulted in an adjusted valuation of $3.59 per square foot. The plaintiffs relied heavily upon the same sale in their analysis but classified the sale as sale No. 6 and sale No. 7, concluding that the resultant valuation was $2.75 for the "rearage" area and $5.16 per square foot for the "frontage." (Pl Ex 2, at 17.)

Plaintiffs' sales No. 6 and No. 7 were combined and the 4.12 acres were developed as Plaza 9, a shopping and retail complex. The plaintiffs alleged that the two sales reflected the market's discounting process for rearage sites, placing them at approximately 55 percent of frontage values.

The defendant alleged that, although the transfer of the property occurred in two deeds, the purchasers indicated that this was done for financing purposes and that the transaction was actually one sale. Mr. David Wagner, developer of Plaza 9, testified that a price was agreed upon for the entire property and that the sale was broken up with two deeds because the development was planned that way and financing

dictated it. This testimony persuades the court that plaintiffs' comparables No. 6 and 7 should be considered as one sale.

Plaintiffs' comparable sale Nos. 1 and 9 were offered by the defendant as sale Nos. 4 and 2, respectively. The defendant's analysis of the sales is the more persuasive; therefore, the court adopts the defendant's conclusion that the subject land had a true cash value of $3.60 per square foot on January 1, 1980.

■ The determination must now be made as to the extent that the $3.60 per square foot value is to be applied to the subject land. When the plaintiffs sold sites to the existing commercial establishments, the sales were accompanied by a "Declaration of Covenants and Restrictions Running with the Land and Grant of Easements" whereby the parties granted to each other certain easements across the respective parcels of real property, resulting in reciprocal access and parking covenants. (Pl Ex 3, § 3, at 3.)

■ A treatise on the appraisal of property states that "* * * it has * * * been held that a landowner whose property is subject to an easement is entitled to a reduced valuation, the value of the easement being added to the estate of the dominant owner. * * *" I Bonbright, *Valuation of Property* 496 (1937).

In *Altman Development Co. v. City of Lansing* (unreported) Mich Tax Tribunal, Docket No. 45493 (1982), in regard to valuing the common areas of condominium projects, the court held that these common areas should be assessed to the living-unit owners and only a nominal assessment should be made for the owner of bare legal title to the common areas.

A second court found that homeowners had the equivalent of easement rights in the common areas of the development and therefore the court ordered an abatement of taxes for the legal owner, a nonprofit homeowners' association. *Waterville Estates Association v. Town of Campton*, (NH) 446 A2d 1167 (1982).

■ The reciprocal access and parking covenants agreed upon between the plaintiffs and its owner-tenants resulted in the granting of easements. The plaintiffs have legal title to the "common areas," the driveway and parking spaces, but cannot sell, rent or make any changes in the use of this area. The

court finds that this restriction does affect the market utility of the subject property. The defendant offered no percentage of market utility; therefore, the court adopts the plaintiffs' percentage of utility. Applying this percentage to the total subject land results in 123,699 square feet. Valuing this area at $3.60 per square foot results in a true cash value for the subject land, on January 1, 1980, of $445,316.40, rounded to $445,300.

The plaintiffs and defendant were quite close in their determinations of depreciated cost of the improvements but differed in the theory of applying a percentage utility for a final valuation figure. The court agrees with the plaintiffs' theory and adopts the percentage figure offered by the plaintiffs of 56.1 percent utility, resulting in a value of $35,300 for the subject improvements.

The remaining utility in use of the subject land and improvements has been granted to and absorbed by the adjacent ownership within Cedarwood Plaza and should be included in the assessed values of each ownership.

The parties stipulated that the true cash value of the subject property on January 1, 1981, should be 10 percent greater than that on January 1, 1980. The true cash value for the tax year 1981-1982 was, therefore, $489,830 for the subject land and $38,830 for the improvements.

■ The last issue for determination is the matter of attorney fees claimed by the plaintiffs on the ground that the Department of Revenue ruling was an arbitrary one and that ORS 183.495 allows such an award under that circumstance. The instance in which attorney fees may be awarded in the Tax Court is dictated by ORS 305.445 and limits that award to those appeals "involving taxes upon or measured by net income in which an individual taxpayer is a party * * *." Such is not the case in this instance; therefore, the claim of attorney fees is hereby denied.

No costs to either party.